DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Lawrence Coreno, Sr., appeals from his convictions in the Lorain County Court of Common Pleas for attempted murder, conspiracy to commit murder, and felonious assault. We affirm.
 I {¶ 2} On August 14, 2002, the Lorain County Grand Jury indicted Mr. Coreno of the following: (1) one count of attempted murder, in violation of R.C. 2903.02(A) and 2923.02(A), a first degree felony; (2) one count of conspiracy to commit murder, in violation R.C. 2923.01(A)(1)/(A)(2), a first degree felony; and (3) one count of felonious assault, in violation of R.C.2903.11(A)(1)/(A)(2), a second degree felony. Subsequently, the State filed a supplemental indictment, adding one firearm specification to each count in the original indictment. Mr. Coreno pled not guilty to all charges.
 {¶ 3} On January 6, 2003, the State filed a motion to consolidate Mr. Coreno's case with that of Marlena Amore[1]
for the purposes of trial, pursuant to Crim.R. 8(A) and 13, asserting that the offenses were of the same or similar character; that the offenses constituted a common scheme or plan or part of a course of criminal conduct; and that Mr. Coreno and Ms. Amore conspired to kill the victim together. Thereafter, Mr. Coreno filed a brief in opposition to the motion to consolidate the trial, and moved pursuant to Crim.R. 14 for relief from prejudicial joinder. On February 6, 2003, a Crim.R. 14 hearing and pretrial were held, pursuant to which the court granted the State's motion to consolidate the trial. The matters proceeded to a jury trial. On April 30, 2003, a jury found Mr. Coreno guilty as to all counts and specifications. The trial court sentenced him accordingly.
 {¶ 4} Mr. Coreno timely appealed, asserting three assignments of error for review. We address Mr. Coreno's second and third assignments of error together, as they involve similar questions of law and fact.
 II A. First Assignment of Error
"The trial court erred to appellant's prejudice when it granted the state's motion to consolidate the trial pursuant to ohio rules of criminal procedure 8(a) and 13 and admitted statements pursuant to evidence rule 801(d)(2)(E) in violation of appellant's state and federal consitutional due process rights to confront and cross-examine witnesses and the right to a fair trial."
 {¶ 5} In his first assignment of error, Mr. Coreno contends that the trial court erred when it granted the State's motion to consolidate the trials and admitted certain statements.
 {¶ 6} To preserve the issue of prejudicial joinder for appeal, a defendant must renew his Crim.R. 14 motion at the close of the State's case, or at the conclusion of all the evidence.State v. Miller (1995), 105 Ohio App.3d 679, 691. Mr. Coreno failed to renew his motion at either of the appropriate times. As such, Mr. Coreno has waived his right to raise this issue on appeal, and therefore we do not address this portion of his first assignment of error.
 {¶ 7} Accordingly, Mr. Coreno's first assignment of error is overruled.
 B. Second Assignment of Error
"The trial court erred to the prejudice of appellant in violation of criminal rule 29[,] article [i] section 10 of the ohio constitution and the due process clause of the constitution of the united states when it denied appellants [SIC.] motion for acquittal."
 Third Assignment of Error
"The trial court erred to the prejudice of appellant when it entered judgment of conviction where, such judgment was against the manifest weight of the evidence."
 {¶ 8} In his second assignment of error, Mr. Coreno avers that it was error for the trial court to deny his Crim.R. 29 motion for acquittal. Specifically, he claims that his convictions for attempted murder, conspiracy to commit murder, and felonious assault were not supported by sufficient evidence in the record. In his third assignment of error, Mr. Coreno avers that his convictions were also against the manifest weight of the evidence. We disagree with both of Mr. Coreno's averments.
 {¶ 9} As a preliminary matter, the Court observes that sufficiency of the evidence and weight of the evidence are legally distinct issues. State v. Thompkins, 78 Ohio St.3d 380,386, 1997-Ohio-52.
 {¶ 10} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim.R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.State v. Wolfe (1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id. "In essence, sufficiency is a test of adequacy." Thompkins, 78 Ohio St.3d at 386.
 {¶ 11} "While the test for sufficiency requires a determination of whether the [S]tate has met its burden of production at trial, a manifest weight challenge questions whether the [S]tate has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, citing Thompkins,78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 12} Sufficiency of the evidence is required to take a case to the jury; therefore, a finding that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462. "Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Id.
 {¶ 13} If the State relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "`such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.'" State v.Daniels (June 3, 1998), 9th Dist. No. 18761, quoting State v.Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus. "`Circumstantial evidence and direct evidence inherently possess the same probative value[.]'" State v. Smith (Nov. 8, 2000), 9th Dist. No. 99CA007399, quoting Jenks, 61 Ohio St.3d 259 at paragraph one of the syllabus. Furthermore, "`[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt.'" State v. Chisolm (July 8, 1992), 9th Dist. No. 15442, quoting Jenks, 61 Ohio St.3d at 272. While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. State v. Lott (1990),51 Ohio St.3d 160, 168, citing Hurt v. Charles J. Rogers Transp.Co. (1955), 164 Ohio St. 329, 331. Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. Lott, 51 Ohio St.3d at 168, citing Hurt, 164 Ohio St. at 331.
 {¶ 14} Additionally, circumstantial evidence is necessary especially when, as in the instant case, a defendant's purpose or intent in doing certain actions is disputed. See State v. Ray
(Dec. 22, 1993), 9th Dist. No. 16050. "The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective proof."State v. Garner, 74 Ohio St.3d 49, 60, 1995-Ohio-168. Intent "`can never be proved by the direct testimony of a third person and it need not be. It must be gathered from the surrounding facts and circumstances[.]'" State v. Johnson (1978),56 Ohio St.2d 35, 38, quoting State v. Huffman (1936), 131 Ohio St. 27, paragraph four of the syllabus. Furthermore, an intent to kill may be inferred from surrounding circumstances, "including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound." State v. Robinson (1954), 161 Ohio St. 213, paragraph five of the syllabus. A person is presumed to have intended the natural, reasonable, and probable consequences of his voluntary acts. State v. Carter, 72 Ohio St.3d 545, 554, 1995-Ohio-104.
 {¶ 15} In the instant case, Mr. Coreno was convicted of attempted murder, in violation of R.C. 2923.02(A) and 2903.02(A), conspiracy to commit murder, in violation of2923.01(A)(1)/(A)(2), and felonious assault, in violation of2903.11(A)(1)/(A)(2). R.C. 2903.02(A), murder, provides in pertinent part that "[n]o person shall purposely cause the death of another[.]" R.C. 2923.02(A), attempt, states in relevant part, "[n]o person, purposely * * *, when purpose * * * is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." A person acts with "purpose" when "it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).
 {¶ 16} R.C. 2923.01(A), conspiracy, states:
"(A) No person, with purpose to commit or to promote or facilitate the commission of * * * murder * * * shall do either of the following:
"(1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
"(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses."
 {¶ 17} R.C. 2903.11(A), felonious assault, provides, in pertinent part, that "[n]o person shall knowingly * * * (1) [c]ause serious physical harm to another * * * [, or] (2) [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2901.22(B) states that a person acts "knowingly" when "he is aware that his conduct will probably cause a certain result or will probably be of a certain nature."
 {¶ 18} Mr. Coreno asserts that the State did not establish beyond a reasonable doubt that it was his purpose to kill the victim, Cleman Bridges; that he had attempted to kill Mr. Bridges; and that an agreement existed between Mr. Coreno and Ms. Amore to kill Mr. Bridges. Applying the applicable law to the facts of this case, we now turn to the evidence adduced at trial.
 {¶ 19} In its case-in-chief, the State presented the testimony of Nancy Opal, who lives across the street from Mr. Bridges. Ms. Opal testified about the events she witnessed the evening of July 9, 2002 as follows: Ms. Opal heard a gun shot. When she ran outside, she saw Mr. Bridges running back and forth in his front yard yelling for help. Ms. Opal ran inside the house, called the police, and returned back outside, at which point she observed Mr. Coreno walk out of Mr. Bridges' house, "take a few steps in front of the house and stop. * * * [H]e took a deliberate stance and aimed, lifted up his arm parallel to the ground and shot." Mr. Coreno was shooting in the same general direction as where Mr. Bridges was standing. Ms. Opal confirmed that the "second shot was not anywhere wild or loose. It was definite straight ahead." A few seconds later, she heard Mr. Coreno shoot a second time.
 {¶ 20} Cleman Bridges, the victim, also testified on behalf of the State. Mr. Bridges testified that he and Ms. Amore had been living together since 1982, and that she had been his "common-law wife for 22 years." Mr. Bridges also testified that he had knowledge of the fact that Ms. Amore and Mr. Coreno had been "seeing each other." He testified that between 1999 and 2001, he had changed the beneficiary of his assets from Ms. Amore to his daughter, and that he informed Ms. Amore of this change. Mr. Bridges further stated that Ms. Amore is a joint survivor on the residence they lived in together.
 {¶ 21} As to the events in question, Mr. Bridges testified as follows: He arrived at home around 10:30 that evening. As he entered his garage through the side door, "[Mr.] Coreno grabbed [him.]" Mr. Coreno held in him a "bear hug," and was holding a stun gun in his hand and a .38 revolver in his other hand Mr. Coreno struck him with the stun gun, burning his side; Mr. Coreno also struck him under his right shoulder. At some point during this exchange, Mr. Coreno stated "loud[ly] and clear[ly,]" "`I am here to kill you, you old son of a b * * *, and [Ms. Amore] can't help you now.'" While they were in the bear hug, Mr. Bridges flipped Mr. Coreno backwards. Mr. Coreno then shot Mr. Bridges in the left shoulder.[2] After he was shot, Mr. Bridges ran out of the garage through the side door of the house to the front of the house, towards the road. While Mr. Bridges was out in his yard, two additional shots were fired at him. Mr. Bridges remembered one shot being fired and flying "six inches over [his] head." After the two shots were fired, Mr. Bridges saw Mr. Coreno attempt to get into Ms. Amore's car, which was parked in the driveway, and then go around the back of the house and back inside the house.
 {¶ 22} Mr. Bridges did state during direct examination that at the time the incident occurred by the garage, he did not know what types of weapons Mr. Coreno had in his hands. However, Mr. Bridges did state that he knew Mr. Coreno had a stun gun because Mr. Coreno had hit him with it three times, and because he saw the blue light of the stun gun.
 {¶ 23} In addition, Mr. Bridges testified that prior to this incident in question, Mr. Coreno had been "threaten[ing] to kill [him]" for approximately one year. Mr. Bridges testified that he had threatened Mr. Coreno back, because Mr. Coreno had threatened him. He also testified that Ms. Amore's relationship with Mr. Coreno influenced his decision to change the beneficiary; he testified that he changed the beneficiary of his assets because Mr. Coreno was threatening to kill him.
 {¶ 24} Mr. Coreno testified on his own behalf. Mr. Coreno testified that he met Ms. Amore in 2001, and that they were engaged in August 2001. Mr. Coreno further testified that their wedding got postsponed because he became ill. As to his interaction with Mr. Bridges, Mr. Coreno testified that in July 2001, he started to receive harassing phone calls and hang up calls, which he asserted were traced to Mr. Bridges' telephone number. Mr. Coreno testified that he believed that Mr. Bridges "hated" him, and that he "didn't care for [Mr. Bridges], either[.]"
 {¶ 25} Regarding the events that occurred on July 9, 2002, Mr. Coreno testified as follows: Ms. Amore called Mr. Coreno at his home. Mr. Coreno then changed his socks, per Ms. Amore's request. He grabbed a blue plastic bag that was lying in his dining room without looking inside; he did not look in the plastic bag to see what it contained before he left his house, because he already knew that a Colt .38 revolver was in the bag. Mr. Coreno drove to North Olmsted with the plastic bag, to meet Ms. Amore. When they arrived at the residence, he took off his shoes at Ms. Amore's request. He then discovered the contents of this plastic bag after he entered Ms. Amore and Mr. Bridges' residence. Specifically, Mr. Coreno found the Colt .38 revolver, a Smith and Wesson .38 revolver, a bolt, a filleting knife, and a stun gun that he had purchased for Ms. Amore to use for protection when she went out at night. Ms. Amore then proceeded to show him around the house. Since he did not want to leave the guns lying around in the house, Mr. Coreno took the guns with him, and put one in his right-hand back pocket, and the other in his left front pocket, and carried the stun gun in his hand Mr. Coreno then learned that Mr. Bridges was arriving at home in his van, at which point Mr. Coreno put his shoes back on and started heading towards the garage.
 {¶ 26} Mr. Coreno then testified about the events that ensued:
"* * * I started to make the turn to head to the little side door, and the lights went out.
"Now, there is a box on the floor that I did not see. So I stumbled into it. And because of the fact that my leg wasn't healed from the surgery yet, I was kind of stumbling forward. I thought I was going to run into the wall, so I kind of put my hands out * * *. And when I got to where I thought the wall was or the little door was, lo and behold, [Mr. Bridges] was there, but I didn't know it, and I ran into him.
"Well, at that point, he is pushing back. He turns around, and he kind of faces me * * *. He was squeezing my hand * * *.
"* * *
"* * * I wanted to get him off of me to push him away, but he is yelling and screaming. And I tried to turn my hand so I could stun him with it, but it wouldn't work.
"So, about that time, I'm going backwards, and I get tangled up in the box again. This time when I'm going backwards and I get tangled up in the box, he finally lets go of my hands, and I start to stumble over the box, and I feel myself getting ready to fall. And I know I got a pistol back here. I don't want to fall on it. So I pulled it out with my right hand I had it in my right hand I'm going down, and hit the ground.
"* * * [M]y elbow come down and hit the floor, and the gun went off.
"* * *
"* * * I got up off the floor, and I went out th[e] little side door. I could hear [Mr. Bridges] outside yelling and screaming and running around.
"I go in front of his van, and I go over to [Ms. Amore's] car, which was next to it.
"* * *
"I'm getting frustrated because I can't get the door open. I just wanted to get in the back seat, lay down on the back seat.
"* * * I'm starting to panic. * * * And I can hear [Mr. Bridges] running around.
"So, I walk around the car. Take a couple of steps into the yard. The last I seen of [Mr. Bridges], he was over * * * by Hedge Row Park and Chestnut Ridge, right along the road.
"I'm facing now * * * towards the darkened part of Chestnut Ridge. And I take and I fire two shots. Not straight up in the air.
"* * * As far as what happened after that, what those bullets hit, I surmise nothing[.]
"* * *
"When I turned around and I started back toward the house, towards the front of the garage, the lady across the street had come out her side door, and she had a phone in her hand And she is yelling * * * that she had called the police. * * * I just walked back in, went inside the garage, went back in the house looking for [Ms. Amore].
"* * *
"I told her, I said, `Get your keys. Let's go. The police are on the way. * * * Let's get out of here.'
"* * * [S]he wanted me to put the guns in the dishwasher. And I started to, then I thought, `That's not a good place. You don't put a gun in the dishwasher.' * * *
"* * * So I took them down the basement[.] * * *
"* * *
"So I went over to the phone, and found it wasn't hung up on the wall. I hung up the phone, dialed the operator. I told her to connect me with the North Ridgeville Police Department. She did.
"* * * I talked to [the Chief] for a minute and a half. I come out[,] * * * and * * * that's when he told me that [Mr. Bridges] got shot. I never knew it. I had no idea the man was injured. I had no intentions of that, either."
 {¶ 27} When asked what his intentions were when he went to the garage that day, Mr. Coreno answered,
"I wanted to talk to [Mr. Bridges]. I wanted to say, `Hey, [Mr. Bridges]. Look. We've got to settle this thing now. It is going beyond what anything should go. You're at my throat. I'm at your throat. This is no good. This is no good for me, no good for you, and no good for everybody around us.' But I never got to say that."
 {¶ 28} Mr. Coreno testified that he wanted to confront Mr. Bridges, and to resolve whether Ms. Amore stayed with Mr. Bridges or with Mr. Coreno. When asked whether he had any discussions with Ms. Amore about killing Mr. Bridges, Mr. Coreno answered as follows:
"Well, the subject come [sic.] up here and there, but nothing that I said, `oh yeah, I'm going to go kill the man.' I had no desire to go and kill the man. I'm not a killer. * * * [F]or me to go out and kill somebody is ridiculous. I mean, there is [sic.] other ways to settle things."
Mr. Coreno confirmed that he and Ms. Amore agreed that he would come to her residence on July 9, 2002, to "`straighten this out[.]'"
 {¶ 29} Additionally, Mr. Coreno testified that he did not intend to kill Mr. Bridges that night. However, Mr. Coreno did testify that while he never told Ms. Amore that he would kill Mr. Bridges, he did say to her that "[he] would like to see him dead[.]" Furthermore, Mr. Coreno confirmed that he did tell the police that he had read the directions to the stun gun on the day the events occurred, that he intended to zap Mr. Bridges with the stun gun to kill him because of Mr. Bridges' high blood pressure, and that this is what Ms. Amore wanted him to do. Mr. Coreno also testified that, in addition to having the two guns and a stun gun on him when he went into the garage, he was wearing latex gloves; he testified that he was wearing them because Ms. Amore is a "clean freak." Mr. Coreno also noted that he was wearing dark blue jeans and a black T-shirt during the incident.
 {¶ 30} When asked on cross-examination whether he and Ms. Amore made a plan to kill Mr. Bridges, Mr. Coreno answered, "[W]e talked about stuff like that." As to the plan, Mr. Coreno stated that he and Ms. Amore "had talked several times about it, but [that he] never took it seriously, and [he] never planned to do it." However, he did testify that he and Ms. Amore "set it up so that she would pick [him] up in North Olmsted at Dugan's Bar so [his] car wouldn't be there, so [Mr. Bridges] wouldn't see [his] car." Mr. Coreno also testified that Ms. Amore was in the room with him when he dumped the contents of the bag at her residence and was aware of the contents of the plastic bag.
 {¶ 31} Lawrence Coreno, Jr. ("Lawrence"), Mr. Coreno's son, testified for the State. Lawrence testified that Mr. Coreno was hospitalized in April 2002 due to medical problems. He also testified that around that time, Mr. Coreno was very upset because Ms. Amore and Mr. Coreno were not seeing each other at the time.
 {¶ 32} Lieutenant Barry Accorti testified on behalf of the State about his involvement in the investigation of the events in question. Lieutenant Accorti testified that during his first interview with Ms. Amore, she stated that she did not know how Mr. Coreno got into the house that night, and that he was there "unannounced and uninvited." He testified that she stated that she "was being held against her will both before and after the shooting, and she had been forced to flee from the house after the shooting." However, Lieutenant Accorti testified that during his second interview with Ms. Amore the next day, Ms. Amore made considerable changes to her story. He testified that when asked again whether she was being held in the home against her will, Ms. Amore answered in the negative. Additionally, he noted that Ms. Amore admitted to him that, as of July 9, 2002, she and Mr. Coreno were involved in a romantic relationship. As to the events on July 9, 2002, he testified that Ms. Amore now stated that she picked Mr. Coreno up at Dugan's Bar in North Olmsted and drove him to her home, a plan that she and Mr. Coreno had discussed prior to her actually picking him up. Lieutenant Accorti also testified that Ms. Amore told him that she knew that Mr. Coreno "was just about indigent[,]" and that she and Mr. Bridges were "very comfortable" financially.
 {¶ 33} Furthermore, Lieutenant Accorti testified that during the second interview, Ms. Amore admitted involvement in the July 9, 2002 proceedings. The State introduced into evidence a tape recording of this second interview, which Lieutenant Accorti verified as accurate. During the interview, Ms. Amore made several statements regarding her involvement with Mr. Coreno in the events in question. Particularly, she stated that she thought that maybe she could have "changed Mr. Coreno's mind[,]" and that "[she] really [did]n't know why [she] agreed" to be involved. Lieutenant Accorti did state, however, that Ms. Amore continued to deny that she intended for Mr. Bridges to be killed that evening.
 {¶ 34} Lieutenant Accorti also testified regarding his interview with Mr. Coreno. He testified that Mr. Coreno consistently denied attempting to kill Mr. Bridges, and that he instead continually used the word "confront[.]" Additionally, Lieutenant Accorti testified as to Mr. Coreno's statements regarding the plan for the events. Specifically, he asserted that Mr. Coreno had stated that Ms. Amore was to provide the transportation, but that she did not want Mr. Bridges killed.
 {¶ 35} The prosecutor also asked Lieutenant Accorti about the weapons involved in the incident. Lieutenant Accorti testified that the weapons were found in the basement of Mr. Bridges' house. He stated that they recovered a number of items, including a loaded .38 Colt revolver with a stethoscope used in the shooting, a loaded Smith and Wesson revolver with a stethoscope, a speed loader loaded with six live rounds of ammunition, a fillet knife, a pair of latex gloves, a wooden handle to an ice pick, and a cell phone. Lieutenant Accorti also identified the electronic stun gun, which he states was found in the yard of Mr. Bridges' home, on the same side of the yard where Mr. Bridges had escaped his home. Lieutenant Accorti also testified that Mr. Coreno had admitted to using a stun gun during the incident.
 {¶ 36} Additionally, Lieutenant Accorti testified as to the fact that one of the bullets that Mr. Coreno fired outside had hit a tree in the yard. He testified that the bullet grazed the tree about eight feet from the ground, and that it was "parallel to the ground rather than up and down, which would be caused by a weapon being fired straight across." Lieutenant Accorti testified that Mr. Coreno had told him that he shot the gun twice in the air out of frustration. However, Lieutenant Accorti also testified that this explanation is inconsistent with the nature of the mark on the tree. Furthermore, Lieutenant Accorti testified that in general, the further a person's "target is away from the mistake that [is made when shooting,] the greater the mistake is exaggerated. * * * The farther you move away, the greater the error becomes. * * * Inexperienced and excited shooters tend to * * * [e]ither push the weapon over when they fire [or] * * * lean into [the gun] and force the weapon up." Lieutenant Accorti described during his testimony what type of impact such a mistake may have: "So aim for my heart, aim a little high, and we're three feet apart, I get hit in the chin. 30 feet apart I get shot in the top of the forehead. 60 feet apart and the bullet goes over my head." As to the distance between Mr. Coreno and Mr. Bridges when Mr. Coreno was shooting in the year, Lieutenant Accorti testified that Mr. Coreno was "pretty close to 100 feet from the tree, and [that] Mr. Bridges [was] still further out than that."
 {¶ 37} Regarding the cell phone found at Mr. Bridges' home, Lieutenant Accorti testified that phone records from July 1, 2002 to July 9, 2002, revealed that 26 phone calls were made from Ms. Amore's phone to Mr. Coreno's home. He further testified that approximately nine of those calls occurred on July 9, 2002, starting at 7:25 p.m. In particular, on the night of the shooting, a call made from Mr. Coreno's home to the cell phone, and another call was made from Dugan's Bar to the cell phone the night of the shooting.
 {¶ 38} Detective Greg Petek testified on behalf of the State about his conversation with Mr. Coreno regarding the incident. He testified that Mr. Coreno stated to him that Ms. Amore had picked him up from Dugan's Bar that evening, and that he brought with him a blue plastic bag carrying the weapons. He further testified that Mr. Coreno had stated that he and Ms. Amore had discussed around July 1, 2002, the plans for her to pick him up from Dugan's Bar. Detective Petek further explained what Mr. Coreno had stated that "[b]asically, she wanted Mr. Coreno to knock [Mr. Bridges] off, were the words he used."
 {¶ 39} Regarding the incident in question, Detective Petek testified that Mr. Coreno had said that he took the two handguns and the stun gun with him into the garage to await Mr. Bridges' arrival home. He then testified that Mr. Coreno had said that he then "approached or went towards Mr. Bridges to confront him[,]" and pressed the button on the stun gun. Detective Petek testified that Mr. Coreno also stated that Ms. Amore had turned the lights off in the garage "in order to surprise Mr. Bridges as he walked into the garage." He stated that Mr. Coreno said that as he was falling, he grabbed the Colt revolver out of his back pocket, and that "he couldn't really explain how, he cocked the hammer, fell to the ground, his arm hit the ground, and the gun just went off."
 {¶ 40} Detective Petek testified that he and another officer attempted to reenact this part of the incident, and that neither of them were successful because his initial instinct was to catch himself, and not to go about it as Mr. Coreno explained he had. Detective Petek then testified that when he confronted Mr. Coreno with the fact that the neighbor had observed the events that occurred in the front yard, Mr. Coreno then changed his story, and "admitted to pointing the gun forward, but that he was not attempting to shoot Mr. Bridges, he was just shooting to the right of Mr. Bridges." Detective Petek also testified regarding Mr. Coreno's statements describing what happened after Mr. Bridges ran out into the front yard and Mr. Coreno ran back inside the house. Detective Petek testified that Mr. Coreno had explained to him that while in the house, Ms. Amore said to him, "`[k]ill [Mr. Bridges]. Kill [Mr. Bridges.]'"
 {¶ 41} Detective Petek also testified as to his discussions with Mr. Coreno regarding the plan he and Ms. Amore devised. He testified that Mr. Coreno explained the plan issue as follows: Mr. Coreno and Ms. Amore discussed prior, on approximately July 1, 2002, as to how they were going to knock off Mr. Bridges, the initial plan was for Mr. Coreno to use the stun gun on Mr. Bridges. Due to Mr. Bridges' high blood pressure, it was supposed to cause him to have a heart attack or kill him that way. Once Mr. Bridges was killed, the plan was to make it look like a robbery; attack him in the garage; kill him; and steal his van and his wallet. Then, Ms. Amore was going to come home, shower, and leave Mr. Bridges' body in the garage until the next morning. Ms. Amore was going to make phone calls to family members, and ask whether or not they had seen Mr. Bridges. Thereafter, Ms. Amore was going to contact the police, report him missing, and then direct them to the garage and have the police find his body in the garage. Furthermore, Detective Petek testified regarding statements Ms. Amore made to him about their plan. Particularly, Ms. Amore had stated that she knew that Mr. Coreno had brought guns and a stun gun with him, and that when she picked Mr. Coreno up from Dugan's Bar, he was carrying a blue plastic bag, and that when they returned to her residence she was aware that he had guns and stun gun on him.
 {¶ 42} Jennifer Shomann testified on behalf of the State. Ms. Shomann testified that she was working at Dugan's Bar on July 9, 2002. She confirmed that Mr. Coreno came into the bar that evening, and that he asked to use the phone. She further testified that Mr. Coreno said to the person on the line that he was at the bar, and that he would be waiting outside, and then the person could come get him.
 {¶ 43} After a careful review of the record, this Court cannot conclude that the jury lost its way and created a manifest miscarriage of justice when it convicted Mr. Coreno of attempted murder, complicity to commit murder, and felonious assault. SeeOtten, 33 Ohio App.3d at 340. After weighing the evidence and all reasonable inferences from the surrounding factual circumstances in this case, we find that the State met its burden of persuasion on the issues of whether Mr. Coreno possessed the purpose to kill Mr. Bridges, and purposely and knowingly engaged in conduct that if successful would cause the death of Mr. Bridges; whether Mr. Coreno planned or aided in planning the commission of Mr. Bridges' murder with Ms. Amore; and whether Mr. Coreno, knowingly caused or attempted to cause physical harm to Mr. Bridges with the weapons he possessed. See Gulley supra;Otten, 33 Ohio App.3d at 340. See, also, R.C. 2923.02(A),2903.02(A), 2923.01(A), and 2903.02(A)(1)/(A)(2).
 {¶ 44} Although some conflicting testimony was presented, we refuse to overturn the verdict because the jury chose to believe other testimony. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757. Furthermore, the jury in this case had the opportunity to view the witnesses' testimony and adjudge their credibility. Therefore, we must give deference to the jurors' judgment, as matters of credibility are primarily for the trier of fact. See State v. Lawrence (Dec. 1, 1999), 9th Dist. No. 98CA007118; State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Accordingly, we hold that Mr. Coreno's convictions for attempted murder, complicity to commit murder, and felonious assault, are not against the manifest weight of the evidence.
 {¶ 45} Having already found that Mr. Coreno's convictions were not against the manifest weight of the evidence, we also conclude that there was sufficient evidence to support the verdicts in this case. See Roberts, supra.
 {¶ 46} Mr. Coreno's second and third assignments of error are overruled.
 III {¶ 47} Mr. Coreno's first, second, and third assignments of error are overruled. The convictions in the Summit County Court of Common Pleas are affirmed.
Judgment affirmed.
Carr, P.J., and Baird, J., concur.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Carr, P. J, Baird, J. concur.
[1] Case No. 02CR060923.
[2] The State introduced into evidence medical records pertaining to his treatment for this injury, as well as the shirt he wore that night which contained bullet holes with blood. The State also introduced into evidence pictures of his injuries.