DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Ronald Barnhardt, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.
 I. {¶ 2} Appellant is a former part-time police officer for the Wellington Police Department ("WPD"). On March 11, 2004, Appellant was indicted on three counts of menacing by stalking, in violation of R.C. 2903.211(A)(1)/(B)(2), felonies of the fourth degree. Appellant's case proceeded to trial on January 24, 2005. Appellant was found not guilty on Count One and the jury was unable to reach a verdict on Counts Two and Three. Appellant's case was set for re-trial on March 14, 2005. On February 25, 2005, Appellant was indicted under the same case number for an additional menacing by stalking charge. The new charge involved a new victim, Laurie Fahler, and alleged conduct which occurred from 1997 to January, 2004. On March 7, 2005, Appellant filed a motion to dismiss Count Four of the indictment, arguing that there was an unjustifiable delay between the offense and the indictment. Appellant asserted that the police were aware of the facts giving rise to the new charge in April of 2004, yet waited nearly a year to indict him on this charge. The trial court denied Appellant's motion to dismiss.
 {¶ 3} In March 2005, Appellant's case was tried before a jury. The jury found Appellant guilty on all three counts of menacing by stalking. The jury additionally found that Appellant had a firearm under his control while committing all three offenses. On March 24, 2005, the trial court adjudicated Appellant a sexual predator, finding that he committed the offenses with a sexual motivation. The trial court sentenced Appellant to ten months incarceration on Count One, eleven months incarceration on Count Two, and one year incarceration on Count Four. All three sentences were to be served consecutively to one another. Appellant timely filed an appeal from the jury's verdict, raising seven assignments of error for our review. We have combined two of Appellant's assigned errors as they are interrelated.
 II. ASSIGNMENT OF ERROR I
"OHIO REVISED CODE 2903.211 IS UNCONSTITUTIONALLY VAGUE ON ITS FACE AND AS APPLIED TO APPELLANT , UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION."
 {¶ 4} In his first assignment of error, Appellant argues that R.C. 2903.211 is unconstitutionally vague. This Court disagrees.
 {¶ 5} Legislative enactments are afforded a strong presumption of constitutionality. State v. Collier (1991),62 Ohio St.3d 267, 269. When possible, statutes are to be construed in favor of conformity with the Ohio and United States Constitutions. Id. A party asserting that a statute is unconstitutional must prove that the statute is unconstitutional beyond a reasonable doubt. Id.
 {¶ 6} When asserting that a statute is unconstitutional because it is void for vagueness, the challenging party must show that the statute is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." Coates v. Cincinnati (1971),402 U.S. 611, 614. Therefore, the challenger must show that, after examining the statute, a person of ordinary intelligence would not be able to understand what he is required to do under the law. State v. Anderson (1991), 57 Ohio St.3d 168, 171. Accordingly, the challenger must prove beyond a reasonable doubt "that the statute was so unclear that he could not reasonably understand that it prohibited the acts in which he engaged." Id.
 {¶ 7} When analyzing a statute under the void-for-vagueness doctrine, a three-part analysis must be applied. Collier,62 Ohio St.3d at 269. First, the wording of the statute must provide fair warning to the ordinary citizen so that citizens may conform their behavior to the requirements of the statute. Id. at 270. Second, the wording of the statute must preclude arbitrary, capricious and discriminatory enforcement. Id. Finally, the wording of the statute should not unreasonably impinge or inhibit fundamental constitutionally protected freedoms. Id.
 {¶ 8} Appellant was convicted of menacing by stalking, in violation of R.C. 2903.211, which provides, in relevant part:
"(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."
"Pattern of conduct," as used in R.C. 2903.211, is defined as "two or more actions or incidents closely related in time [.]'" R.C. 2903.211(D)(1).
 {¶ 9} Appellant asserts that the determination of whether the statute was violated depends on the subjective perception of the victim. He reasons that he was convicted for conduct which might cause distress to one person but not to another. Appellant next contends that the term "pattern of conduct," fails to provide any standard of conduct. He argues that the statute did not adequately apprise him that the conduct of which he is accused constitutes the offense of "menacing by stalking." We find no merit in these contentions.
 {¶ 10} Appellant misconstrues the statute. As stated previously, in order to violate the statute, a defendant must act knowingly. R.C. 2903.211 requires that the offender "knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." "Knowingly" is one of the culpable mental states defined in R.C. 2901.22(B):
"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 11} Therefore, in order to show that a defendant violated R.C. 2903.211, the State must show that the defendant engaged in conduct that he knew would probably cause the complainant to believe that defendant would harm her or that he knew would "probably cause" the complainant to suffer from mental distress. Accordingly, a defendant cannot be convicted based on the subjective beliefs of a particular complainant. If a defendant knows his behavior will cause the complainant distress, the defendant is not at the whim of the complainant to determine what behavior is prohibited.
 {¶ 12} Even if the statute is vague in some manner, the level of intent required by the statute can mitigate any perceived vagueness. State v. Werfel, 11th Dist. Nos. 2002-L-101, 2002-L-202, 2003-Ohio-6958, at ¶ 61. As stated previously, in order to violate the statute, a defendant must act knowingly. "The scienter requirement vitiates any claim that the statute's purported vagueness could mislead a person of ordinary intelligence into misunderstanding what is prohibited." Werfel,
supra, at ¶ 62. Under our review of the statute, we find that an "ordinary citizen" would be able to discern the conduct prohibited by this statute. This statute criminalizes conduct only under a specific mental state and provides clear guidelines for enforcement. Therefore, we find this statute is not void for vagueness. Appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
"APPELLANT[`S] CONVICTION ON COUNT FOUR OF THE INDICTMENT WAS IN VIOLATION OF HIS STATUTORY AND CONSTITUTIONAL RIGHTS TO A SPEEDY TRIAL."
 {¶ 13} In his second assignment of error, Appellant contends that the indictment on Count Four violated his right to a speedy trial. We disagree.
 {¶ 14} Both the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution guarantee a criminal defendant the right to a speedy trial.State v. Pachay (1980), 64 Ohio St.2d 218, 219. Courts must strictly enforce such rights. Id. at 221. This "strict enforcement has been grounded in the conclusion that the speedy trial statutes implement the constitutional guarantee of a public speedy trial." Id., citing State v. Pudlock (1975),44 Ohio St.2d 104, 105.
 {¶ 15} Appellant does not argue that the State failed to bring him to trial within the time required by the speedy trial statutes. Rather, Appellant contends that the State's pre-indictment delay in charging him with Count Four violated his constitutional rights. More specifically, Appellant points out that Count Four relates to conduct as far back as 1997, and he argues that the police had the information a year earlier but waited to charge him on this new count until a few weeks before trial. Appellant contends that it was nearly impossible for him to defend this charge because it was difficult for him to account for his whereabouts at the specific times outlined in Count Four.
 {¶ 16} When there has been an unjustifiable delay between the commission of an offense and a defendant's indictment for the offense that results in actual prejudice to that defendant, a defendant's right to due process under Section 16, Art. I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution have been violated. State v. Luck
(1984), 15 Ohio St.3d 150, paragraph two of the syllabus. When determining whether an indictment should be dismissed due to an unreasonable pre-indictment delay, the defendant has the initial burden of producing evidence to demonstrate that the delay has caused actual prejudice to the defense. State v. Whiting
(1998), 84 Ohio St.3d 215, 217. After the defendant establishes actual prejudice, the state has the burden of proving evidence of a justifiable reason for the delay. Id. "Proof of actual prejudice to the defendant must be specific and non-speculative; the defendant bears the burden of demonstrating the exculpatory value of the evidence of which he was deprived due to the delay."State v. Tullis, 10th Dist. No. 04AP-333, 2005-Ohio-2205, at ¶14, citing State v. Peoples, 10th Dist. No. 02AP-945, 2003-Ohio-4680.
 {¶ 17} Appellant relies solely on the argument that he was prejudiced because the delay hindered his ability to locate and present relevant witnesses and evidence. However, Appellant cannot establish actual prejudice merely by asserting the absence or difficulty of locating relevant witnesses and evidence.Tullis, supra, at ¶ 15. Rather, to establish actual prejudice, Appellant must be able to demonstrate the specific way in which these witnesses would have aided his defense. Id. Appellant has failed to meet the first prong of the test as he has not set forth specific witnesses he would have produced and the exculpatory testimony these witnesses would have presented. He has not, therefore, established actual prejudice. Consequently, the burden did not shift to the State to present evidence of a justifiable reason for the delay. Appellant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III
"APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHERE THE TRIAL COURT IMPROPERLY JOINED A NEW OFFENSE WHERE THE NEW OFFENSE WAS INDICTED ONLY TWO WEEKS BEFORE TRIAL."
 {¶ 18} In his third assignment of error, Appellant contends that the trial court improperly joined Count Four of the indictment two weeks prior to trial. We disagree.
 {¶ 19} To preserve the issue of prejudicial joinder for appeal, a defendant must renew his motion at the close of the State's case or at the conclusion of all the evidence. State v.Miller (1995), 105 Ohio App.3d 679, 691. Appellant failed to renew his motion at either of the appropriate times. As such, Appellant has waived his right to raise this issue on appeal, and therefore we do not address his third assignment of error. Statev. Coreno, 9th Dist. No. 03CA008288, 2004-Ohio-1752, at ¶ 6. Accordingly, Appellant's third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV
"THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUEST FOR A CONTINUANCE OF THE TRIAL DATE, THEREBY DENYING APPELLANT OF EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS OF LAW AND A FAIR TRIAL."
 {¶ 20} In Appellant's fourth assignment of error, he contends that the trial court erred in denying his request for a continuance of the trial date and thereby denied him the effective assistance of counsel, due process of law and a fair trial. We disagree.
 {¶ 21} The decision to grant or deny a continuance rests within the sound discretion of the trial court. Ungar v.Sarafite (1964), 376 U.S. 575, 589; State v. Komadina, 9th Dist. No. 02CA008104, 2003-Ohio-1800, at ¶ 30, citing State v.Unger (1981), 67 Ohio St.2d 65, 67. Thus, an appellate court must not reverse the denial of a continuance absent an abuse of discretion. Id. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio StateMed. Bd. (1993), 66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.
 {¶ 22} When reviewing a motion for continuance, a court should consider the following factors:
"[T]he length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." Unger, 67 Ohio St.2d at 67-68.
 {¶ 23} On February 4, 2005, the parties agreed to a March 14, 2005 date for re-trial of the two counts of menacing by stalking. Appellant was indicted on an additional count of menacing by stalking on February 25, 2005. At the beginning of the second trial Appellant made an oral motion to continue the trial on Count Four. The trial court denied this motion. Appellant contends that as a result of the trial court's denial of his motion for continuance, he was denied the effective assistance of counsel and due process of law. He argues that he did not have adequate time to prepare a defense because he was indicted a few weeks before trial and received the State's discovery responses, including their witness list, ten days before trial. Appellant specifically alleges that he was prejudiced because he did not have adequate time to review his whereabouts at the time of the alleged offenses and could not adequately defend this charge.
 {¶ 24} Upon review, we find no abuse of discretion in the trial court's decision not to continue the trial on Count Four. The trial court afforded Appellant the opportunity to speak with the "new" witnesses (Elaine Keppler, Steve Keppler and Janet Behe) before these witnesses took the stand. The State established that it had flown Janet Behe in for the trial and that it would incur great expense to fly her in at another time in the event that Count Four was tried at a later date. Moreover, such a continuance would be a great inconvenience to Ms. Behe who worked full-time.
 {¶ 25} Finally, and perhaps most importantly, Appellant was well aware of the substance of Elaine Keppler's claims by at least January 20, 2005. Ms. Keppler was listed as a witness for the State in the first trial and the State filed a notice of intention to use other acts as evidence on January 20, 2005. In this notice, the State specifically advised that it sought to introduce evidence of Appellant's prior harassment of Ms. Keppler. The State specifically set forth the various acts of harassment. Moreover, Appellant's counsel had met with Ms. Keppler prior to trial. Consequently, we find that Appellant was familiar with the facts surrounding Ms. Keppler's claims of harassment and suffered no prejudice as a result of the denial of his motion to continue. Appellant's fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR V
"THE TRIAL COURT ERRED IN DENYING APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL WHEN THERE WAS INSUFFICIENT EVIDENCE TO PROVE THE ELEMENTS OF MENACING BY STALKING."
 ASSIGNMENT OF ERROR VI
"APPELLANT'S CONVICTIONS FOR MENACING BY STALKING WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 26} In his fifth and sixth assignments of error, Appellant argues that insufficient evidence was produced to support the jury's verdict and that his convictions were against the manifest weight of the evidence. We disagree.
 {¶ 27} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim.R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt.State v. Wolfe (1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id.
 {¶ 28} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citingState v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). Further,
"[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2.
Therefore, we will address Appellant's claim that his conviction was against the manifest weight of the evidence first, as it is dispositive of his claim of insufficiency.
 {¶ 29} When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 30} Appellant was convicted of three counts of menacing by stalking in violation of R.C. 2903.211(A)(1)/(B)(2). R.C.2903.211(A)(1)/(B)(2) provides that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." "Knowingly" is one of the culpable mental states defined in R.C. 2901.22(B):
"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
In addition, the jury found that Appellant had a firearm on or about his person or under his control while committing each of these offenses.
 {¶ 31} The State presented eleven witnesses including the three victims: Laurie Fahler, Elaine Keppler, and Rachel McKee. Appellant testified and presented nine witnesses.
Laurie Fahler
 {¶ 32} Laurie Fahler testified that the incidents with Appellant began in February 2004. Laurie and her husband became acquainted with Appellant through the towing company they operated which serviced the Village of Wellington. Laurie recalled that the first incident with Appellant occurred when he came into the Rite-Aid, where she worked at the time, and approached her while she was stocking shampoo. Appellant was dressed in his uniform and was carrying his firearm. Appellant informed Laurie that he had seen her car in the parking lot and decided to visit her. He then pointed at her chest and stated "I want to see those." Appellant then asked Laurie about the location of pipe cleaners. When Laurie directed Appellant to the appropriate location he stated "oh, those are colored ones, that could be fun."
 {¶ 33} When Laurie left work that day, Appellant was waiting outside the store for her. Appellant was dressed in his police uniform and was carrying his firearm. In light of Appellant's comment earlier in the day about wanting to see her breasts, Laurie was nervous to be alone with him. Accordingly, she asked a co-worker not to leave her alone with him. Appellant asked Laurie to accompany him to the police auxiliary building. Laurie declined and altered her route so that she could follow her co-worker home. She did not want Appellant to follow her to her house.
 {¶ 34} Laurie recalled an incident wherein Appellant emailed her and asked her to send him pictures of herself. According to Laurie, the only reason Appellant had ever previously emailed her was to transmit codes which served to alert tow truck drivers that their services were needed. The two had never communicated by email about anything personal, let alone the transmission of photographs.
 {¶ 35} On another occasion, Appellant accompanied another officer into the Rite-Aid store. Laurie walked the officers out of the store after the other officer made a purchase. Appellant then offered Laurie a ride home after work. Laurie declined, noting that her own car was parked in the store parking lot. She pointed her car out to Appellant, as she thought it was odd that Appellant would ask her if she needed a ride home.
 {¶ 36} At another time, Appellant came into the store to purchase lotion and a newspaper. He asked to speak with Laurie. By this time she had informed the store employees to lie and say she was not working whenever Appellant inquired about her. The employee lied and told Appellant she was not working that day.
 {¶ 37} Another incident occurred one night when Laurie arrived home after working until 4:00 a.m. unloading a truck at Rite-Aid. Immediately after Laurie pulled into her driveway she noticed a bright light in her review-mirror. Laurie soon realized that the vehicle was a police car and that the officer was shining his spotlight directly on her. Laurie was scared and immediately exited her car and ran inside her home. Once inside, Laurie realized that she could not contact the police because Appellant might be the officer to respond to her call. Laurie was so fearful of Appellant that she closed all the blinds in her house and was unable to sleep for the rest of the day. The next day, Laurie reported the incident to the police. Later that day, Appellant came into Ride-Aid and asked Laurie whether it was she or her husband that he saw speeding through town at 4:00 a.m. the previous night. Laurie then realized that Appellant was the officer that had followed her into her driveway.
 {¶ 38} Laurie finally called the police to report Appellant's conduct after he once again visited the store while she was working. On that day, Laurie's co-workers alerted her that Appellant had entered the store and she fled to the stockroom to avoid an encounter. She testified that she was a "nervous wreck" and called the police. An officer came to the store and Laurie reported the incidents to him.
 {¶ 39} Laurie testified that she was very afraid of Appellant and specifically feared that Appellant might try to rape her or pull his gun on her. She testified that as a result of Appellant's actions, she was nervous when home alone. However, Laurie testified that she never told Appellant to leave her alone or asked him to leave the Rite-Aid store. She explained that she never told him to leave the store because she did not feel that she could tell a uniformed police officer to leave Rite-Aid — a public place. Laurie also admitted that she never informed Appellant that he was scaring her. She testified that she was concerned that she might get an unwarranted traffic ticket if she openly rebuked Appellant. Instead, Laurie adapted her lifestyle to avoid Appellant.
 {¶ 40} The State presented two of Laurie's co-workers who confirmed her stories regarding her interactions with Appellant. One co-worker testified that Laurie was nervous and rattled after one confrontation with Appellant. After Appellant left the store, the co-worker asked Laurie if the officer was the one that had been bothering her. A teary-eyed Laurie replied, "yes."
 {¶ 41} Another co-worker testified that Laurie had to retreat to the stockroom when Appellant arrived because she became nervous and upset. She confirmed Laurie's story that Appellant was waiting for them outside of the store when they left work one evening. The co-worker testified that Laurie followed her home that evening because Laurie was afraid that Appellant might follow her home.
Elaine Keppler
 {¶ 42} Elaine Keppler testified that she first met Appellant in 1997 while she was employed at a gas station in Wellington. Appellant was a friend of Elaine's husband, Steve, and often came into Elaine's workplace. Initially, Elaine and Appellant had an amicable relationship. She testified that Appellant would often talk and joke with her while she worked. After some time, the relationship changed. One day, Appellant came into the gas station and grabbed Elaine by the wrists. She told him she did not want him to do that and he let go of her wrists.
 {¶ 43} Elaine also testified that Appellant would call and ask her for naked photographs of herself. She testified that when she and Appellant were chatting online he would ask her for photographs and ask her if she had a camera on her computer with which she could take photographs of herself. She told Appellant that she did not want any pictures taken of herself.
 {¶ 44} Elaine testified that on more than sixty occasions Appellant called her late in the evening, when her husband was at work. Eventually, Elaine obtained Caller I.D. and no longer answered Appellant's phone calls. According to Elaine, Appellant stopped at her residence on several occasions during the late evening. She testified that on most of these occasions, Appellant was dressed in his uniform and was carrying his firearm. Steve was generally not at home during Appellant's visits. She testified that Appellant was very aggressive during these encounters and often threatened to place his handcuffs on her.
 {¶ 45} Elaine testified regarding an incident that occurred in the fall of 2003 while Steve's cousin, Janet Behe, was visiting from North Carolina. The WPD were called after Elaine's dog was attacked by a neighbor's dog. Appellant responded to the call. The next day, Appellant stopped at Elaine's house. Only Elaine and Janet were home at the time. Appellant told the women that he wanted to check on Elaine's dog. Elaine asked Appellant if she could hold his gun. Appellant handed the firearm to Elaine. She held it for a minute or so and then handed it back to Appellant. Elaine testified that Appellant then threatened to handcuff her and again held her wrists so tightly that she could not break free. He was carrying a firearm at this time. Elaine told Appellant that he was hurting her and asked that he let go of her wrists. She said she had to tell him three or four times before he let go. She testified that he only let go once she told him that her daughter was upstairs asleep. According to Elaine, after the incident, she was crying and very scared.
 {¶ 46} Elaine had another encounter with Appellant the next day while she was working as a crossing guard. Elaine was seated in her vehicle, accompanied by Janet. Appellant walked up to the vehicle. Elaine kept the vehicle doors locked and rolled the window down only to the extent needed to talk to him as she was fearful of him by this time. Elaine briefly talked to him through the slit in the window.
 {¶ 47} On another occasion, Elaine was seated in her family room, dressed in her bathrobe, when Appellant approached her back door. Elaine let him in. He then tried to kiss her. Elaine told him that she did not want him to kiss her. She testified that he cornered her up against their floor model television set and once again tried to kiss her. She again told him no. Appellant then opened Elaine's robe. At that same time, Appellant received a call that there was a train wreck and he left her residence to respond to the call. She testified that she was very frightened as a result of Appellant's actions. She explained that she did not call the police to report his actions because "[h]e is the police." She eventually reported Appellant's conduct to the police after Steve told a Wellington police officer to talk to Elaine about the incidents.
 {¶ 48} On cross-examination, Elaine testified that Appellant and her husband had shared pornographic photographs of women. She also testified that Steve told her that Appellant asked him for nude pictures of her and that she told him "no way." She acknowledged that the incidents with Appellant occurred for approximately three years before she said anything to anyone.
 {¶ 49} Janet Behe also testified for the State. She confirmed Elaine's story that Appellant grabbed Elaine's wrists in an aggressive manner and that Elaine struggled to get free from his hold. She testified that Appellant was grinning while he was restraining Elaine. According to Janet, Elaine appeared extremely frightened during this ordeal and had tears in her eyes. She testified that she was extremely shocked by Appellant's actions and considered calling 911. She also corroborated Elaine's story about the events that transpired the next day when Appellant approached their vehicle while Elaine was working as a crossing guard. She stated that Elaine was visibly shaken after this second encounter with Appellant.
 {¶ 50} Steve Keppler also corroborated his wife's testimony. He similarly testified that Appellant had asked him for naked pictures of his wife. Steve testified that Appellant responded to their house when they called to report that their dog had been attacked. Steve also stated that Elaine and Janet told him about the incident with Appellant the day after the dog attack. He stated that Elaine appeared shaken up when he returned home from work that day.
 {¶ 51} Steve also testified that he encountered Appellant one night while Appellant was working patrol. According to Steve, Appellant told him about a woman that worked on the south side of town who liked to expose her breasts. He also told Steve about sexual encounters he had with other women in the town while he was on patrol.
Rachel McKee
 {¶ 52} Rachel McKee testified as follows. She had many personal and legal problems during the summer of 2003, including consistent drug and alcohol abuse. She first encountered Appellant when he and Officer McCoy of the WPD arrested her at her apartment after she broke a window at her boyfriend's parents' house. The officers suggested that she change out of her pajamas before taking her to the police station and watched her while she changed her clothes. Appellant attended almost every pretrial or court hearing scheduled for this offense. Appellant often talked to Rachel during these court proceedings. He offered to help her find a job. He often told her that he "wanted" her and "stuff like that." Every time Appellant approached Rachel he would make sexual comments to her. Rachel gave him both her phone number and her mother's phone number so that he could call them regarding any job opportunities he might find for her.
 {¶ 53} After the trial, Rachel often encountered Appellant when she left the Wellington bars at night. Appellant would often wait outside the bars for her and ask her to meet him behind various gas stations and other buildings. Wellington police officers had driven her home from the bars on a few occasions. On at least one occasion, she exposed her breasts to a Wellington police officer after he drove her home from the bar. Appellant often told her that he wanted to see what the other officers had seen. She interpreted this to mean that the other officer(s) had told him that she exposed her breasts to them. Appellant also told Rachel that he deserved to see her body because he helped her get out of trouble. Appellant was on duty during these encounters and was dressed in full uniform.
 {¶ 54} Rachel did not report Appellant's conduct or tell him that he was scaring her because she felt that she was already in "trouble" and was trying to resolve her legal problems and did not want to diminish her chance of getting out of trouble. Despite Appellant's promises, he never contacted her regarding a job opportunity. Appellant called her about thirty or forty times and she never returned any of his phone calls.
 {¶ 55} Rachel finally decided to contact the police after an encounter with Appellant in the spring of 2004. On that day, Appellant came to her apartment and knocked on her door several times. He then proceeded to call her several times. Rachel was at home at the time but was so frightened of Appellant that she hid in her closet to avoid him. Appellant left after knocking at the door for three to five minutes. Rachel watched out the window as Appellant then drove around her apartment complex for about thirty minutes. Rachel was frightened to leave her apartment for fear that Appellant would see her. She felt trapped in her apartment. When Appellant finally stopped circling the area, Rachel ran out to her car and drove to her mother's house.
 {¶ 56} When Rachel left her mother's house later that day, Appellant was waiting in his patrol car down the street from her mother's house. Rachel got in her car and started driving away. Appellant drove up behind Rachel and followed her very closely. The speed limit was 25 mph so Rachel sped up to 27 mph to try to increase the distance between her car and Appellant's. Appellant then pulled her over. Appellant approached Rachel's vehicle, told her he had just been at her house and asked her where she had been. She lied and told him she had been running. Appellant did not seem to believe her story. Rachel became very upset with Appellant. Rachel told Appellant she had to leave because she was going out of town. Appellant did not issue Rachel a traffic ticket or warning. Rachel drove away from the scene. Rachel then told her mother about her encounter with Appellant. Her mother reported Appellant's conduct to the WPD. The police then contacted Rachel and questioned her about these incidents.
 {¶ 57} Rachel's mother, Kandi McKee, also testified. Kandi testified that Rachel was leading a wild lifestyle during the summer of 2003. She acknowledged that Rachel had been arrested and explained that Appellant befriended them during Rachel's first pretrial. She testified that Appellant appeared interested in helping Rachel find a job. She also testified that Rachel became increasingly distressed about her relationship with Appellant. Kandi consistently urged Rachel to report his conduct to the police but Rachel was nervous about doing that. She testified that on one occasion, Rachel called her crying and told her that she was hiding in her closet because Appellant was knocking at her door. When Rachel arrived at Kandi's house later that day, she appeared very upset and was still crying. Kandi urged her to call the police. Kandi called the police later that day.
 {¶ 58} Carol Nydza, a dispatcher with the WPD, also testified. In her testimony, Ms. Nydza recounted a discussion she had with Appellant wherein he told her he had arrested Rachel McKee and that he was excited because he had seen her naked.
Appellant
 {¶ 59} Appellant testified as follows. Appellant is acquainted with Laurie Fahler, Rachel McKee and Laurie Kepler but has not threatened any of them with physical harm and has not demanded sexual favors from any of them. None of these three women ever appeared upset or afraid when he was around. If he had known that he had upset any of these women, he would have stayed away from them.
 {¶ 60} Appellant and Laurie Fahler's husband talked about nude photos Laurie's husband had of her. Appellant had a discussion with Laurie about sexual conduct between her and her husband. Appellant corroborated Laurie's story that he had asked her whether it was her or her husband that he saw speeding the previous night.
 {¶ 61} Appellant also testified that Rachel came up to him in a bar one night and flashed him. He then told her "you can't do that." Appellant admitted that he made some phone calls to Rachel but denied making as many as she claimed he had made. He also admitted that he had joked with her about the fact that she had exposed herself to Wellington police officers. According to Appellant, all of these interactions were pleasant. Appellant once told Rachel that he had some job applications for her and she told him to come to her house and drop off the applications.
 {¶ 62} With regard to Elaine, he testified that he and her husband had discussed pornographic materials. Appellant admitted that on more than one occasion he asked Elaine to give him naked pictures of her. Appellant agreed that he was at Elaine's house on the night of the train wreck in April 2003. He acknowledged that he had grabbed Elaine around the wrists, however, in contrast to Elaine's testimony, Appellant claimed that he and Elaine were just "horsing around" at the time. Appellant continued to communicate with Elaine even after the allegations arose.
 {¶ 63} On cross-examination, Appellant admitted that he had agreed to resign from his job with the Brunswick Police Department and in exchange, the police department agreed to dismiss a case that had been filed against him. He further admitted that he lied on his application to the WPD because he did not disclose the actual reason he left the Brunswick Police Department.
 {¶ 64} Appellant contends that the State failed to present sufficient evidence that he "knowingly" caused mental distress to any of the victims. Upon thorough review of the record, we find that Appellant's convictions are supported by the manifest weight of the evidence. The State presented ample evidence that Appellant engaged in a pattern of conduct whereby he repeatedly visited these women while on duty for the WPD, wearing his uniform and carrying his firearm, and solicited them for naked pictures of themselves and/or asked them to expose themselves to him. Appellant even admitted that he had asked these women for nude photographs and/or joked with them about exposing themselves. Appellant also admitted that he was often on duty, dressed in his uniform complete with his firearm, during these encounters. Each of the victims testified that Appellant's actions caused them severe emotional distress. The victims also testified that they feared that Appellant would cause physical harm to them. These victims' stories were confirmed by several witnesses who observed Appellant's encounters with the victims and saw the distress Appellant caused the victims.
 {¶ 65} Appellant was a police officer in a small town. Appellant knew that his victims could not report his conduct to the police for fear that he would respond to the call. Appellant created a dilemma for his victims: they could face unwarranted traffic tickets and citations if they failed to succumb to his solicitations yet they were hesitant to report his conduct to the police as he was one of a few officers in a small-town police department. From this evidence, the jury could reasonably conclude that Appellant knew that when he consistently made sexual comments to women and repeatedly pursued them around town while wearing his police uniform and carrying a firearm, that these women would suffer mental distress.
 {¶ 66} Appellant contends that none of the women appeared afraid or upset with him during any of these encounters. However, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v.DeHass (1967), 10 Ohio St.2d 230, at paragraph one of the syllabus. The trier of fact is in the best position to judge the credibility of the witnesses. In this case the jury believed the victims' testimony.
 {¶ 67} As this Court has disposed of Appellant's challenge to the weight of the evidence, we similarly dispose of his challenge to its sufficiency. Roberts, supra, at *2. Necessarily included in this court's determination that the jury verdict was not against the manifest weight of the evidence, is a determination that the evidence was also sufficient to support the conviction. Id. Accordingly, Appellant's fifth and sixth assignments of error are overruled.
 ASSIGNMENT OF ERROR VII
"THE TRIAL COURT ERRED IN SENTENCING APPELLANT TO CONSECUTIVE TERMS OF INCARCERATION."
 {¶ 68} In his seventh assignment of error, Appellant contends that the trial court erred in sentencing him to consecutive terms of incarceration because the trial court ignored the guidelines set forth in Ohio's sentencing statutes. Essentially, Appellant contends that his sentence was unsupported by the evidence. We disagree.
 {¶ 69} This Court reviews Appellant's sentence utilizing an abuse of discretion standard. State v. Windham, 9th Dist. No. 05CA0033, 2006-Ohio-1544, at ¶ 12. An abuse of discretion is more than an error in judgment or law; it implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Furthermore, when applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons, 66 Ohio St.3d at 621.
 {¶ 70} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, the Ohio Supreme Court found that Ohio's sentencing structure was unconstitutional to the extent that it required judicial fact-finding. Id. at paragraphs one through seven of the syllabus. "In constructing a remedy, the Foster court excised the provisions it found to offend the Constitution, granting trial court judges full discretion to impose sentences within the ranges prescribed by statute." State v. Gordon, 9th Dist. No. 23009, 2006-Ohio-2973, at ¶ 8, citing Foster, supra.
 {¶ 71} The Foster Court noted that "there is no mandate for judicial fact-finding in the general guidance statutes. The court is merely to `consider' the statutory factors." Foster at ¶ 42. Therefore, post-Foster, trial courts are still required to consider the general guidance factors contained in R.C. 2929.11
and R.C. 2929.12 in their sentencing decisions. A review of the record indicates that the trial court's decision to impose more than the minimum sentence took into account those statutory factors.
 {¶ 72} R.C. 2929.11 provides in pertinent part as follows:
"(A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.
"(B) A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."
 {¶ 73} In addition, R.C. 2903.211(A)(1)/(B)(2) provides that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." Menacing by stalking is a fourth degree felony where the defendant has a firearm on or about his person or under his control while committing the charged offense. See R.C.2903.211(A)(1)/(B)(2)(f).
 {¶ 74} As Appellant was convicted under the latter provision, the trial court was permitted to sentence Appellant anywhere within the six to eighteen month range for each of his three convictions. R.C. 2929.14(A)(4). At Appellant's sentencing hearing, the trial court admonished Appellant, stating:
"Mr. Barnhardt, you were a police officer. Your conduct not only affects these women, but it tears at the very fabric of law enforcement. Every police officer will now have to overcome the breach of trust that your conduct has caused. You used your occupation to obtain the results. You had an obligation as a police officer not only to prevent stalking offenses, but to bring those who committed stalking offenses to justice.
"Further, the harm caused to the community of Wellington, and for these particular victims, is so great and unusual that a single term will not adequately reflect the seriousness of the conduct, nor is a community-controlled sanction appropriate.
"When police officers use their gun, their badge, their lights and their sirens to stalk women in a community that is a very small place, where these victims have no alternative but to dial 911 and get you to respond, where they believe that there is no help, where they are especially vulnerable, the harm is so great, not only to them, but to the community and to the public at large."
 {¶ 75} Based upon the above, we cannot say that the trial court acted in an unreasonable or arbitrary manner in imposing consecutive sentences. Not only was Appellant a police officer at the time he committed these crimes, but worse yet, he was on duty during these encounters. As the trial court aptly noted, at the time Appellant was stalking these women, he was being paid to prevent and apprehend people who were committing this same offense. The fact that Appellant never physically harmed these women does not diminish the severity of his offenses. There was ample evidence that Appellant used his position of power to intimidate and manipulate these women and that these women feared Appellant. Further, the trial court specifically considered the fact that Appellant was a first-time offender and had no prior criminal convictions.
 {¶ 76} We find no abuse of discretion in the trial court's decision to sentence Appellant to consecutive sentences as this sentence reflects the court's desire to deter Appellant from committing further offenses and punish him for his reprehensible conduct. See R.C. 2929.11. Appellant's seventh assignment of error is overruled.
 III. {¶ 77} Appellant's seven assignments of error are overruled, and the judgment of the Lorain County Common Pleas Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Whitmore, P.J. Boyle, J. concur.