[Cite as *Morrison v. Dible*, 2025-Ohio-4415.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
WYANDOT COUNTY

CHRISTI M. MORRISON,

     PETITIONER-APPELLEE,

    v.

JEFFREY A. DIBLE,

     RESPONDENT-APPELLANT.

CASE NO. 16-25-01

OPINION AND
JUDGMENT ENTRY

Appeal from Wyandot County Common Pleas Court
Domestic Relations Division
Trial Court No. 24-DR-87

Judgment Affirmed

Date of Decision: September 22, 2025

APPEARANCES:

    *Sagan Kahler* **for Appellant**

    *Kelle Saull* **and** *Douglas M. Morehart* **for Appellee**

**WALDICK, P.J.**

{¶1} Respondent-appellant, Jeffrey Dible ("Dible"), appeals the judgment of the Wyandot County Court of Common Pleas granting a domestic violence civil protection order ("CPO") pursuant to R.C. 3113.31 in favor of petitioner-appellee, C.M. For the reasons set forth below, we affirm.

*Procedural History*

{¶2} Dible and C.M. are an ex-boyfriend and ex-girlfriend who resided together in 2024. On November 12, 2024, C.M. filed a petition in the trial court for a domestic violence CPO against Dible, requesting the court issue an *ex parte* emergency CPO. On November 12, 2024, the trial court issued an *ex parte* protection order and scheduled a full hearing on the petition for November 22, 2024.

{¶3} On November 22, 2024, Dible did not appear for the full hearing, nor did counsel appear on his behalf. The trial court found that Dible had not been served, and therefore continued the matter until proper service could be made. The trial court also reassigned the full hearing for January 10, 2025.

{¶4} On January 10, 2025, the trial court held a full hearing on C.M.'s petition. C.M. testified in support of her request for a CPO. In opposition, Dible presented the testimony of two witnesses: himself and his sister, Lisa Browning. The trial court then ruled from the bench, granting the CPO. On January 13, 2025, the trial court journalized the CPO against Dible, effective until November 12, 2029.

{¶5} On January 31, 2025, Dible filed the instant appeal, in which he raises one assignment of error.

### Assignment of Error

**The trial court erred as a matter of law when it granted the appellee's petition for domestic violence civil protection order against the appellant because the pattern of conduct giving rise to the protection order is protected by the respondent's right to free speech.**

{¶6} In the sole assignment of error, Dible asserts that the trial court erred in granting the CPO, arguing that his conduct giving rise to the CPO is constitutionally protected speech under the First Amendment to the United States Constitution.

{¶7} We review a trial court's decision to grant or deny a CPO for an abuse of discretion. *Hamon v. Weeks*, 2021-Ohio-1770, ¶ 7 (3d Dist.), citing *Montgomery v. Kleman*, 2019-Ohio-4526, ¶ 8 (3d Dist). A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "If there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion." *Hamon v. Weeks*, *supra*, at ¶ 7, citing *Ross v. Ross*, 64 Ohio St.2d 203, 204 (1980); *Warnecke v. Whitaker*, 2011-Ohio-5442, ¶ 12 (3d Dist.).

{¶8} The issuance of a domestic violence civil protection order is governed by R.C. 3113.31, which allows a court to grant a protection order after a full hearing "to bring about a cessation of domestic violence against * * * family or household

members or persons with whom the respondent is or was in a dating relationship."

R.C. 3113.31(E)(1).

{¶9} Pursuant to R.C. 3113.31(A)(1), "domestic violence', as used in that statutory section, means any of the following:

(a) The occurrence of one or more of the following acts against a family or household member:

(i) Attempting to cause or recklessly causing bodily injury;

(ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

(iii) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;

(iv) Committing a sexually oriented offense.

(b) The occurrence of one or more of the acts identified in divisions (A)(1)(a)(i) to (iv) of this section against a person with whom the respondent is or was in a dating relationship.

R.C. 2903.211, referenced in R.C. 3113.31(A)(1)(a)(ii), prohibits menacing by stalking and provides, in relevant part:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or

identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:

(a) Violate division (A)(1) of this section;

(b) Urge or incite another to commit a violation of division (A)(1) of this section.

{¶10} Pursuant to R.C. 2903.211(D)(1), "pattern of conduct" means "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions of incidents[.]" Pursuant to R.C. 2903.211(D)(2), "mental distress" means (a) "[a]ny mental illness or condition that involves some temporary substantial incapacity", or (b) "[a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services."

{¶11} At the full hearing held on the CPO petition in the instant case, C.M. testified that she and Dible began an official dating relationship on November 8, 2023, which lasted until C.M. ended the relationship on August 2, 2024. C.M. ended the relationship due to Dible being verbally and emotionally abusive. C.M. testified that there was also domestic violence in the relationship. After C.M. broke off the

relationship and requested that Dible move out of the home they had been sharing, Dible mounted a smear campaign against C.M. C.M. testified that the initial incident involved Dible parking his car outside of the Upper Sandusky post office for three days straight, after having written a message about C.M. in window marker on the car's back window. The message read, "I survived living with [C.M.] after being beaten and stabbed to death and dog poop thrown on me, * * * asking one just people and exes to confirm she's a nut job." Dible's car was parked at the post office so that the message in the back window was on display to any persons passing by on the street, and C.M. recognized the handwriting as Dible's.

{¶12} After the incident involving Dible's car at the post office, his car was moved around the corner and was parked in front of the museum for three days, with a message on the window reading, "After being * * * beat up multiple times, * * * dog shit thrown on me and * * * had to go to the ER after cutting my eye, * * * domestic violence is never the answer * * *. She has a history of doing this to men. She is a nut job, just ask others. Just ask other men in her past." C.M. testified that she recognized that message to have been in Dible's daughter's handwriting. The message on Dible's car when parked at the museum also included C.M.'s home address.

{¶13} C.M. testified that after the car had been parked at the museum for three days, it was moved to a local bank, where it was parked for approximately twelve hours with the same message displayed.

{¶14} C.M. testified that Dible's car was then moved back to the museum. After that, the car was parked in front of the Methodist church, with a similar message about C.M. displayed on poster board on the inside of the back window. That message also contained C.M.'s address and phone number. Dible then subsequently parked the car in front of C.M.'s house for three days with a similar message displayed. C.M. testified that Dible continued moving his car, and the messages contained on or in it, to various locations for a period of nearly three weeks.

{¶15} In addition to displaying messages about C.M. posted on his car, C.M. testified that Dible also posted large signs on poster board all down the street near her place of employment, Mennel Milling. C.M. recognized the writing on those signs to be that of both Dible and his daughter. One sign, posted directly outside the door of Mennel Milling, read, "[C.M.] is Mennel community pussy. Just go to the closest cemetery by Seminole 5:00 p.m. and you will get a great view of Google maps." Another sign posted near her work place said, "[C.M.] has had more last names than kids. She has been married five times. She even married a pedophile * * * and let him be around * * * her kids."

{¶16} C.M. testified that Dible specifically told her in messages sent to her that he wanted her to look like a laughing stock and that he would ruin her life. C.M. testified that her coworkers and her operations manager saw the posters put up near her place of employment, and C.M. felt her job may be in jeopardy.

{¶17} Finally, C.M. testified that Dible's stalking-type behavior had caused her mental anguish, that she had begun mental health counseling as a direct result of his behavior, and that she would be starting medication as recommended by her mental health professional in order to help cope with the emotional stress caused by Dible.

{¶18} Based on that evidence, the trial court issued the domestic violence civil protection order after making the determination that Dible engaged in a pattern of conduct that knowingly caused mental distress to C.M.

{¶19} On appeal, as in the trial court, Dible does not dispute that he engaged in most of the conduct at issue. Rather, Dible argues that such behavior amounted to free speech protected by the First Amendment to the United States Constitution.

{¶20} The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

{¶21} However, as Dible acknowledges in his merit brief, the protections of the First Amendment are not absolute and it is well established that the government may regulate certain categories of expression consistent with the Constitution. *Virginia v. Black*, 538 U.S. 343, 358 (2003).

**{¶22}** This Court addressed a First Amendment challenge to a civil stalking protection order in *Bey v. Rasawehr*, 2019-Ohio-57 (3d Dist.) (judgment rev'd in part by *Bey v. Rasawehr*, 2020-Ohio-3301). In our preliminary analysis of the general constitutional issues involved in that case, where the protection order was based on a violation of R.C. 2903.211 as in the instant case, this Court stated as follows:

> At the outset we note that several Ohio appellate districts have addressed constitutional challenges to R.C. 2903.11, Ohio's menacing by stalking statute, on the grounds that its proscription of conduct is vague, arbitrary, or violates the First Amendment, and have been found [*sic*] such arguments to be meritless. *See e.g.*, *State v. Plants*, 5th Dist. Tuscarawas No. 2009 AP 10 0054, 2010-Ohio-2930; *State v. Barnhardt*, 9th Dist. Lorain No. 05CA008706, 2006-Ohio-4531; *State v. Werfel*, 11th Dist. Lake Nos. 2002-L-101, 2002-L-102, 2003-Ohio-6958.
>
> As aptly stated by the Fifth Appellate District, underpinning the rationale stated in these cases is the acknowledgement that "although we all hold dear the First Amendment protections, we are all aware that freedom of speech is not absolute. As such, there are classes of unprotected speech i.e., threatening words, obscene speech, fighting words, speech that interferes with the rights of others, speech that creates a clear and present danger, and defamatory speech." *State v. Wieger*, 5th Dist. Stark No. 2008CA00132, 2009-Ohio-1391, ¶ 19.
>
> Likewise, the United States Supreme Court has long held that "otherwise proscribable criminal conduct does not become protected by the First Amendment simply because the conduct happens to involve the written or spoken word. *See e.g.*, *United States v. Alvarez*, 567 U.S. 709, 721 (2012) (plurality opinion) (noting that "speech integral to criminal conduct" remains a category of historically unprotected speech; accord *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (citations

omitted)); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets) ....").

Further, the United States Supreme Court recognized that not all speech is of equal First Amendment importance. It is speech on "'matters of public concern'" that is "at the heart of the First Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 (1985), quoting *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978), citing *Thornhill v. Alabama*, 310 U.S. 88, 101 (1940). Rather, the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). In contrast, speech on matters of purely private concern is of less First Amendment concern. *Connick v. Myers*, 461 U.S. 138, 146-47.

Here, R.C. 2903.211 clearly criminalizes specific conduct directed toward another person when done for an illegitimate purpose. As explained above, the unrefuted evidence presented by the petitioners supported the trial court's finding that the specific conduct, for which Rasawehr now asserts is expressive of a public concern and protected by the First Amendment, was not engaged in for a legitimate reason, but instead for an illegitimate reason born out of a vendetta seeking to cause mental distress to his mother and sister and to exact personal revenge.

*Bey*, *supra*, at ¶¶ 38-42.

{¶23} While our decision in *Bey* was subsequently reversed by the Supreme Court of Ohio as it related to the propriety of a specific clause in the protection order at issue, the general constitutional principles set forth in our opinion remain valid. Furthermore, those principles are equally applicable to the case before us.

{¶24} As our judicial colleagues of the Seventh District Court of Appeals aptly noted in *Miller v. Leone*, 2024-Ohio-1325 (7th Dist.), "'[i]t has been recognized that threats which intimidate or cause fear or apprehension by the recipient are unprotected by the First Amendment.'" *Id.*, at ¶ 33, quoting *State v. Myers*, 2000 WL 327238, *3 (3d Dist. Mar. 30, 2000), citing *Dayton v. Dunnigan*, 103 Ohio App.3d 67, 71 (1995). "It is not 'within the protection of the First Amendment's guarantee of free speech to knowingly cause another to believe one will cause physical harm or mental distress to him or her by engaging in two or more actions or incidents closely related in time.'" *Id.*, quoting *State v. Bilder*, 99 Ohio App.3d 653, 664 (9th Dist.1994).

{¶25} On the basis of the legal authority cited above, and in light of the nature of the conduct upon which the trial court granted the protection order in this case, we find Dible's First Amendment argument to be without merit.

{¶26} The assignment of error is overruled.

*Conclusion*

{¶27} Having found no error prejudicial to the respondent-appellant, Jeffrey Dible, in the particulars assigned and argued, the judgment of the Wyandot County Court of Common Pleas is affirmed.

**Judgment affirmed**

**MILLER and WILLAMOWSKI, J.J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignment of error is overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

 

 

Juergen A. Waldick, Judge

 

 

Mark C. Miller, Judge

 

 

John R. Willamowski, Judge

DATED:
/jlm